**IT IS ORDERED as set forth below:**

**Date: March 26, 2021**

_____

**Jeffery W. Cavender**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 18-69488-JWC |
| ELLERY MYRON STEED, | CHAPTER 13 |
| Debtor. | |
| ELLERY STEED, | |
| Plaintiff, | |
| v. | ADVERSARY PROCEEDING |
| GSRAN-Z, LLC, and INVESTA SERVICES, LLC, | NO. 19-5201-JWC |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

This matter came before the Court upon the Complaint for Damages (the "Complaint") filed by Ellery Myron Steed ("Plaintiff") in the above-captioned adversary proceeding. The adversary proceeding arises out of Plaintiff's Chapter 13 bankruptcy case, Case No. 18-69488-jwc (the "Bankruptcy Case"). Plaintiff filed the adversary proceeding against GSRAN-Z, LLC

1

("GSRAN-Z") and Investa Services, LLC ("Investa" and together with GSRAN-Z, "Defendants")

on April 30, 2019, seeking damages for alleged willful violations of the automatic stay under 11

U.S.C. § 362(k)[1] and related alleged violations of the Fair Debt Collection Practices Act (the

"FDCPA") and state law negligence claims.

## I.   SUMMARY JUDGMENT AND BACKGROUND

The Court entered an Order on April 1, 2020 (Doc. No. 38) (the "Summary Judgment

Order") ruling on cross motions for summary judgment filed by Plaintiff and Defendants.  The

following is a summary of the findings of undisputed facts and legal conclusions in the Summary

Judgment Order.

Investa, on behalf of clients such as GSRAN-Z, purchases and services writs of *fieri facias*

("fi. fa(s).") issued for unpaid ad valorem taxes and solid waste bills on real property in Fulton

County, Georgia.  Investa's portfolio includes several fi. fas. issued on Plaintiff's home (the

"Property").  Plaintiff filed his Bankruptcy Case on November 19, 2018 and scheduled both

Defendants as creditors.  Investa, for GSRAN-Z, filed two secured proofs of claim.  For reasons

unrelated to Defendants, the Court dismissed the Bankruptcy Case by order on February 13, 2019.

*See* Bankruptcy Case Doc. No. 29 (the "Dismissal Order").  While the Bankruptcy Case stood

dismissed, and consequently no automatic stay was in place, Investa directed the Fulton County

Sheriff to levy on its fi. fas. and sell the Property.

On March 14, 2019, again for reasons unrelated to Defendants, the Court vacated the

Dismissal Order and reinstated Debtor's Bankruptcy Case.  *See* Bankruptcy Case Doc. No. 34 (the

"Reinstatement Order").  The Clerk of Court served the Reinstatement Order on both Defendants

by mail on March 19, 2019 to the notice address provided in Investa's proofs of claim, among

---

[1] All statutory references are to the Bankruptcy Code (11 U.S.C. § 101 *et seq.*) unless otherwise specified.

other addresses.  *See* Bankruptcy Case Doc. No. 36.  Though Investa and GSRAN-Z actually received the Reinstatement Order via mail at some point, the date of receipt has never been made clear in the record.

On April 11, three weeks after reinstatement of the Bankruptcy Case, the Sheriff posted notice at the Property (the "First Notice") that it would be sold at auction on June 4, 2019 (the "June Tax Sale").  Plaintiff quickly called the Sheriff's Department, which advised that Investa must give instruction to stop the sale and provided Plaintiff with "Ms. King's" contact information at Investa.  After several unsuccessful attempts to contact Ms. King, Plaintiff talked with her on April 16 and explained the Bankruptcy Case prevented the sale.  Ms. King indicated the Bankruptcy Case had been dismissed.  Plaintiff explained it had been reinstated.

A week later, Plaintiff found two more delinquency notices at the Property from the Sheriff's Department dated April 19 and addressed to RESIDENT/TENANT/OCCUPANT (the "Second Notices").  The Second Notices stated the Property would be advertised for sale if the unpaid taxes were not paid within 20 days.  Plaintiff again called the Sheriff's Department and again was advised the Sheriff had received no instruction from Investa to halt collection efforts. The June Tax Sale was advertised in the *Daily Report* during the month of May, 2019 (the "May Advertisement"), but the June Tax Sale did not take place.  Defendants offered no evidence they made any effort to stop the First Notice, the Second Notices, or the May Advertisement, instead arguing they had no duty to stop the sale process because it was conducted by the Sheriff.

Based on these undisputed facts, the Court ruled that Investa had actual knowledge of the Reinstatement Order before the First Notice, Second Notices, and May Advertisement, that Investa had a duty to stop the sale process after the Reinstatement Order, that Investa took no apparent

action to stop the Notices or Advertisement, and that Investa willfully violated the automatic stay by failing to stop them.

The Court reserved for trial all issues related to Plaintiff's alleged damages and GSRAN-Z's liability. The Court dismissed the FDCPA Claim. The Court reserved the state law negligence claims for trial, but Plaintiff subsequently withdrew the negligence claims. *See* Doc. No. 56. The Court held a trial on damages and GSRAN-Z's liability on September 25, 2020 and took the matter under advisement at the conclusion of the trial. Upon consideration of the testimony and documentary evidence admitted, arguments presented by the parties, the pleadings submitted, and the record in this case, the Court makes the following findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052:

II.   **FINDINGS OF FACT**

The Court adopts the above-summarized findings of undisputed facts from the Summary Judgment Order for purposes of this opinion and makes the following findings of fact from the evidence at trial.[2]

### A.  **The Property, Unpaid Taxes, and December Tax Sale**

Plaintiff purchased the Property in 2004. Plaintiff failed to pay real estate taxes on the Property since 2011, resulting in tax liens of nearly $15,000 by 2018. He lost his job in 2011 and could not afford to pay for repairs needed to the Property and taxes at the same time. He elected to repair the Property and forego his tax obligations. The repairs took six to seven years to complete, and his plan was to pay for the repairs as he could without taking out a loan. After

---

[2] To the extent any findings of fact set forth herein constitute conclusions of law, the Court adopts them as conclusions of law. To the extent any conclusions of law set forth herein constitute findings of fact, the Court adopts them as findings of fact.

completing the repairs, he intended to lease a portion of the Property and apply for a payment plan to bring his tax obligations current.

In October of 2018, Plaintiff contacted Investa and spoke to Kameeka King ("Ms. King") to discuss a payment plan. Investa's offer required several thousand dollars up front and $700 per month. Meanwhile, Investa initiated the levy process on its fi. fas. and scheduled the Property for a tax sale on December 4, 2018 (the "December Tax Sale"). Unable to meet the terms of a payment plan, Plaintiff filed his Bankruptcy Case. The day before the December Tax Sale, Plaintiff contacted Investa to ensure it would not go forward because of his Bankruptcy Case.[3] He again spoke with Ms. King, who requested evidence of Plaintiff's Bankruptcy Case and Property ownership. Plaintiff promptly provided the requested information. Investa's counsel reviewed the information and instructed King to pull the Property from the tax sale immediately, which she did.

**B.   The Tenant and Lease**

In the interim Plaintiff put word out that he was looking to rent a portion of his house (the "apartment"). An individual interested in the apartment contacted Plaintiff sometime in October of 2018—around the same time Plaintiff was discussing a payment plan with Investa. The individual, who testified at trial, will be referred to as "Tenant." Neither Plaintiff nor Tenant could remember the person who put them in touch, but Tenant first agreed to rent the apartment in late October of 2018.

Here, the Court pauses to note that the following paragraphs offer a summary of Tenant's and Plaintiff's testimony relative to the lease, Tenant's stay at the apartment, and some of the

---

[3] Plaintiff denied any memory of receiving tax notices for the December 2018 sale, but he obviously received some notice that spurred him to call Investa on December 3rd to inquire if the tax sale had been pulled. Also, Georgia law requires tax sales be advertised four consecutive weeks prior to the scheduled sale date, and notice of the advertisement must be given at least 20 days prior to the first advertisement. *See* O.C.G.A. §§ 9-13-140 and 48-3-9. Thus, the December Tax Sale would have been noticed in early-to-mid-October, around the same time Plaintiff contacted Investa about a payment plan.

Court's impressions of the testimony.  As will become apparent, many discrepancies and omissions raise considerable doubt about the lease and its terms and whether Tenant actually lived in the apartment.  The Court finds much of the below-described testimony to be incredible and will summarize its factual findings relative to the lease after summary of the testimony.

Both Plaintiff and Tenant testified they agreed to a three-year lease with monthly rent of $750, but according to Plaintiff and Tenant, the three-year term was at Plaintiff's insistence.[4] Tenant testified he initially wanted to rent the apartment beginning December 1, 2018 but later requested to push the start date to January 1, 2019 in hopes of receiving expected settlement funds in a pending lawsuit.[5]  Tenant testified that Plaintiff did not disclose during their discussions that the Property was subject to a tax sale scheduled for December 4.

Plaintiff and Tenant both signed a written lease showing a term from January 1, 2019 to December 31, 2022, but much of the written lease did not conform to reality.  Among other things, the face of the lease shows rent of $7.50 per month and a $5.00 security deposit.  Both Plaintiff and Tenant testified the $7.50 rent provision was a typo corrected at the time of execution, but no copy of the corrected lease was offered into evidence.  Plaintiff testified he did not retain a corrected copy and the only copy corrected was Tenant's.  Tenant testified he made the January rent payment of $750 by money order and used a receipt at trial to refresh his recollection, but the receipt was not offered into evidence.  He testified he paid February, March, and April rent in cash. Plaintiff testified he deposited January rent into his bank account and provided a bank statement showing a $750 counter credit, but he did not deposit the other payments and used them for living expenses.  Both parties testified no security deposit was paid.  Plaintiff testified he did not need a security deposit so long as he was careful who he leased the apartment to, but he also testified he

---

[4]  The Complaint alleged a five-year term.  Doc. No. 1, ¶13.

[5]  Tenant's testimony on this point was muddled and confusing.

did not conduct any kind of background check on Tenant, could not remember who referred Tenant

to him, and did not know whether Tenant had ever leased property before or fallen behind on lease

payments.  The leased space did not have a refrigerator or working stove—contrary to the terms

of the written lease.[6]  Though the written lease required Tenant to pay all utilities other than water,

no utilities were put in his name and he unequivocally testified he did not pay any utilities.  Plaintiff

offered contrary testimony that Tenant paid Plaintiff for certain utilities, though he did agree no

utilities were put in Tenant's name.

Despite describing the apartment as "great" and testifying that he slept there "about" every

night during the five months he lived there, Tenant could not recall a lot about the apartment and

became somewhat defensive on cross examination when asked about specifics.  Among other

things, Tenant could not recall whether the apartment had running water.[7]  While the Court can

understand forgetting details like who paid which utilities and which appliances were where, it is

simply hard to believe that someone who allegedly lived in an apartment for five months and

stayed there "about" every night could not remember whether it had running water.

On direct examination Tenant testified he received no business-related mail at the

apartment because he was an Uber driver and all business communication was via email.  On re-

direct he offered a conflicting story that he leased the space because he had a business in Haiti and

took the apartment to have a business address.  Plaintiff offered even further conflicting testimony

during his direct examination that he believed Tenant rented the space to conduct extramarital

affairs.

---

[6]  Tenant testified he provided his own small refrigerator.  Plaintiff testified there was an old stove in the space but it was not available for use.

[7]  Plaintiff testified the water was working but did not know if Tenant turned it on.  On cross examination, Plaintiff admitted he was delinquent on his water bills while Tenant leased the space and had received cutoff notices.  He also testified he worked out a repayment plan with the water company after dismissal of his Bankruptcy Case.

The above-summarized testimony and evidence raises as many questions in the Court's mind as it answers about Tenant's lease of the apartment. While there is substantial evidence supporting the existence of some lease arrangement between Tenant and Plaintiff, much, if not all, of Tenant's testimony was undermined by the inconsistencies in his own testimony and the testimony of Plaintiff. One thing clear is the written lease was an empty formality to which neither Tenant nor Plaintiff paid any regard. Neither knew its terms. Tenant indicated he never read it at all. The Court doubts Plaintiff ever did as he did not even retain a correct copy for his records. When asked about a specific provision regarding rent payment, Plaintiff testified he did not know what the lease provided, that he had agreed separately with Tenant on that issue, and as a party to the lease he could "change that anytime I want so long as it's agreed to by the tenant." True enough, but that testimony betrays the true nature of the agreement between Tenant and Plaintiff: they made it up as they went. Accordingly, the Court gives the same weight to the written lease as Plaintiff and Tenant—none.

The Court also does not believe the evidence supports a finding that Tenant and Plaintiff ever intended the lease to be a three-year residential lease. Whatever the reason Tenant needed the apartment, be it a bureau or extramarital rendezvous, the evidence did not show it to be his residence. However long Tenant intended to stay there, the agreement to do so was as capricious as the terms of the written lease. The Court suspects Plaintiff's insistence on a three-year term in the written document was done so Plaintiff could show a source of income for feasibility of his chapter 13 plan in the underlying Bankruptcy Case, not because he ever intended to hold Tenant to a three-year lease term. That said, the Court does find that Tenant and Plaintiff had at least an oral agreement for Tenant to use the apartment month-to-month for $750 per month.

### C. **Lease Termination**

After seeing the First Notice posted at the Property about the June Tax Sale, Tenant spoke with Plaintiff. Plaintiff told him it had to be a mistake because of the Bankruptcy Case. Tenant accepted that explanation because he himself had been in bankruptcy before. When Tenant saw the Second Notices, however, he told Plaintiff he would move out because he thought his right to be in the Property was in jeopardy. Plaintiff agreed to allow Tenant out of the lease but remain through May without paying additional rent. Plaintiff testified he tried to convince Tenant to stay, but he let Tenant out of the lease lest Tenant sue him for failing to honor his obligations as landlord. He also testified part of his decision to let Tenant out of the lease was that he could "always get another tenant" to "mitigate that situation," but he did not try to get another tenant because Investa did not return his calls after April 16 and he did not know the status of the June Tax Sale. Here, the Court has some doubts. Plaintiff's theory in this case has been that Tenant broke the lease because of the stress of losing his residence. As discussed above, the Court does not believe Tenant used the apartment as his residence. Nor is the Court convinced Plaintiff made much of an effort to convince Tenant to stay. Tenant testified it was Plaintiff who first raised the possibility of being sued, not Tenant. Nonetheless, the Court accepts Tenant's testimony that the repeated Notices prompted his request to terminate the lease and Plaintiff's agreement to do so. The Court does not, however, accept that Plaintiff's decision not to seek another tenant was because Investa did not call him back and uncertainty about the June Tax Sale. For one, Plaintiff never requested in the Complaint or by any motion in his Bankruptcy Case that the June Tax Sale be stopped despite filing this adversary proceeding over a month before the scheduled tax sale. It is not credible to believe that Plaintiff, who is keenly diligent and skilled in pursing his rights in court, would not seek to stop the tax sale in this adversary or his Bankruptcy Case if he believed his Property was

at risk.  Moreover, Plaintiff agreed to lease the apartment to Tenant while the December Tax Sale was pending, and the Court does not find it credible that uncertainty about the June Tax Sale prevented him from re-letting the apartment after Tenant moved out at the end of May, especially considering the June Tax Sale did not occur.

### D.  Investa's Actions in April

The First Notice of the June Tax Sale was posted at the Property around April 11.  Plaintiff tried to reach Investa multiple times unsuccessfully and left messages for a return call.  He finally spoke to Ms. King on April 16 to ask why a tax sale was proceeding considering his pending bankruptcy.  Ms. King responded that the bankruptcy had been dismissed.  Plaintiff advised it was reinstated.  Like their previous conversation on December 3, Ms. King asked Plaintiff to provide proof of the reinstatement and evidence of ownership.  Plaintiff told Ms. King she could obtain the needed information from PACER and the deed records electronically.  Plaintiff testified he asked to speak to an attorney or leave word for an attorney to return his call, both of which were refused unless he hired counsel.  Ms. King testified she never informed Plaintiff he had to hire counsel to speak to an attorney but did confirm she asked him to provide documentation.  Plaintiff did not provide the requested documentation.  Because she did not receive the requested documents, Ms. King did not pull the June Tax Sale after the April 16 phone call.  The Second Notices issued a few days later, and the May Advertisement proceeded.  Plaintiff filed this adversary proceeding on April 30.  Only then did Investa's counsel instruct Ms. King to pull the June Tax Sale on May 8, which she did immediately.  After receipt of the Second Notices, Plaintiff continually called

Investa to inquire about the sale but could never reach anyone or have his calls returned.[8]  Investa

offered no evidence or testimony to contradict Plaintiff's testimony on this point.

Ms. King testified Investa had nothing to gain by allowing a tax sale to go forward in the

face of a pending bankruptcy.  She acknowledged the failure to pull the June Tax Sale prior to

May 8 was a slip up in Investa's process, but any failure to remove the sale was not done

maliciously or intentionally.  Ms. King also testified the Defendants had nothing to gain by not

pulling the June Tax Sale after the Reinstatement Order because the sale would have been void

and would have to be rescinded.  Plaintiff testified on cross examination that Investa's owner had

borrowed heavily to invest in tax liens and was having difficulty liquidating the tax liens fast

enough to cover the debt obligations.  Plaintiff insinuated that these loan difficulties led to Investa's

efforts to liquidate tax liens, including his, on an expedited basis.  Plaintiff offered no evidence to

support this theory and stated it was based on his internet searches of Investa and its owners.  The

Court does not find such unsubstantiated allegations compelling or supportive of Plaintiff's theory

of the case and gives it no weight.

### E.  **The Aftermath**

Plaintiff testified that after the loss of his tenant, he did not know what to do.  Rent from

Tenant was the only way to fund his bankruptcy plan, and he did not have money to eat or pay for

his utilities.  He was also concerned about losing his house given the substantial amount of work

he put into it.  Plaintiff testified that he had to figure out how he was going to keep the lights on

but at the same time could not wash clothes or flush the toilet.[9]  Plaintiff again testified he had an

---

[8] Debtor testified it was not until he received discovery responses as part of this litigation that he was made aware the Property was pulled from the tax sale on May 8, but Plaintiff knew the tax sale had been pulled no later than June 4 when the sale did not occur.

[9] This testimony was not credible given Debtor's testimony that his water was never cut off.

opportunity to try and re-let the Property after Tenant moved out, but he wanted to get an understanding of the status of matters with Investa before doing so and they would not return his calls.  When the June Tax Sale did not occur, he had not given up hope of finding a new tenant, but other intervening events made leasing the space infeasible.  Among other things, his hot water heater went out two to three months after May, and he could not afford to fix it.  He had a roof leak he paid for with funds from a settlement against another party, and he faced the prospect of dismissal of his Bankruptcy Case because he could no longer make his plan payments.  He ultimately decided to voluntarily dismiss his Bankruptcy Case in December of 2019.  Not long after the dismissal, the Covid-19 pandemic hit, which Plaintiff testified made any rental of the Property difficult.  Plaintiff offered no expert testimony or any supporting evidence about rental market conditions and the effect of the pandemic.

Plaintiff testified Investa's stay violations led to a panoply of problems for him.  He was sad and unhappy, unsure of what was going to happen to him and whether he would have a house to live in or food to eat.  He could not sleep at all as he spent all his time thinking and worrying about how to get out of this mess.  The only way he could sleep was to drink alcohol, and his drinking had the added benefit of suppressing his appetite.  His lack of sleep and drinking on an empty stomach was not a good mix and resulted in headaches and feeling tired all the time.[10]  He also said he could not travel like he had done in the past.  He used to travel to North Carolina frequently and bought MARTA passes to travel around Atlanta, but he was forced to walk long distances in the heat of the summer resulting in painful and swollen ankles and knees.  Plaintiff did not consult a doctor relative to any of his issues because he could not afford one, and he had not received any treatments for any issues as of the time of trial.  When asked how he could be

---

[10] Plaintiff testified that he drank alcohol to suppress his appetite to reduce his food intake to one meal a day.  Plaintiff offered no explanation for how he was able to afford alcohol while struggling to afford food.

sure Defendants caused his pain and suffering, Plaintiff testified that if he had never lost his tenant, he would have had the opportunity to be successful in his Bankruptcy Case and pay his outstanding tax obligations through his chapter 13 plan.

## III.    CONCLUSIONS OF LAW

### A.  Jurisdiction

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Plaintiff's claims for violations of the automatic stay arise under § 362(k) and constitute core claims pursuant to 28 U.S.C. § 157(b).

### B.  Damages

"[A]n individual injured by any willful violation of a stay . . . shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k). Plaintiff "has the burden of proving damages from an automatic stay violation by a preponderance of the evidence." *Mantiply v. Horne (In re Horne)*, 876 F.3d 1076, 1083 (11th Cir. 2017) (citation omitted); *Heghmann v. Hafiani (In re Heghmann)*, 316 B.R. 395, 404-05 (1st Cir. B.A.P. 2004). Plaintiff asserts three categories of damages: (1) actual damages from termination of the lease; (2) actual damages for emotional distress; and (3) punitive damages. The Court addresses each in turn.

#### 1.  Lease Termination

"Unlike general, special, and compensatory damages, [ ] 'actual damages' has no consistent legal interpretation." *In re Horne*, 876 F.3d at 1080-81 (citing *Fitzpatrick v. IRS*, 665 F2d 327, 329 (11th Cir. 1982)). "Actual damages should be awarded only if there is concrete evidence supporting the award of a definite amount. Once a party has proven that he has been damaged, he

needs to show the amount of damages with reasonable certainty.  A damages award cannot be based on mere speculation, guess or conjecture." *In re Heghmann,* 316 B.R. at 405 (cleaned up). Plaintiff asserts the First Notice and Second Notices caused Tenant to terminate the lease toward the end of April 2019, causing Plaintiff to lose $24,000 of rent for the 32 months remaining on the lease.  Defendants question whether the lease existed at all and argue Plaintiff had a duty to mitigate his damages but failed to do so by allowing Tenant to terminate the lease without cause and failing to re-let the apartment.

As discussed, Plaintiff established by a preponderance of the evidence that he and Tenant had a month-to-month lease for $750 per month, but Plaintiff failed to establish the written lease governed the terms of the agreement.  Instead, the agreement was governed by whatever terms Plaintiff and Tenant agreed to at their pleasure.  Further, Plaintiff failed to establish that Tenant used the apartment as his residence or intended to live there for three years.  Thus, Plaintiff has not established by a preponderance of the evidence that he is entitled to 32 months of rent under the terms of the written lease.  Plaintiff did establish, however, that the First and Second Notices caused Tenant to terminate the lease sooner than he would have in the absence of the Notices. Certainly, Tenant would have stayed and paid through the month of May since he remained in the space in May (using it for whatever purpose).  It is also reasonable to conclude he would have stayed through July, but anything beyond that point the Court finds too speculative given the parties' loose relationship with any formal terms and the dubious nature of the testimony and evidence of Tenant's use of the apartment.  Accordingly, the Court awards $2,250 (three months) of lost rent damages.

### a. *Mitigation of Damages*

Even if the Court found the lease to have a three-year term, Plaintiff would not be entitled to 32 months of damages because he failed to mitigate his damages.  Many cases conclude debtors have "a duty to exercise due diligence in protecting and pursuing his rights and in mitigating his damages with regard to [stay] violations."  *Clayton v. King (In re Clayton),* 235 B.R. 801, 811 (Bankr. M.D.N.C. 1998); s*ee also, e.g., Mitchell v. Anderson (In re Mitchell)*, 545 B.R. 209, 220 (Bankr. N.D. Ohio 2016) ("Even damages that are actually suffered may not be recoverable as 'debtors have an obligation to attempt to mitigate damages prior to seeking court intervention.'" (citing *In re Oksentowicz,* 324 B.R. 628, 630 (Bankr. E.D. Mich. 2005))); *In re Schang,* No. 14-51178, 2015 WL 3441178, *3 (E.D. Mich. May 28, 2015); *Cousins v. CitiFinancial Mortg. Co. (In re Cousins),* 404 B.R. 281, 290 n. 9 (Bankr. S.D. Ohio 2009); *In re Risner,* 317 B.R. 830, 840 (Bankr. D. Idaho 2004) ("there is also a consensus in the case law that, in determining reasonable damages under § 362(h), the bankruptcy court must examine whether the debtor could have mitigated the damages[.]" (citing *Eskanos & Adler, P.C. v. Roman (In re Roman)*, 283 B.R. 1, 12 (9th Cir. B.A.P. 1995))); *In re Rosa,* 313 B.R. 1, 9 (Bankr. D. Mass. 2004) ("Debtors are indeed under a duty to mitigate their damages resulting from automatic stay violations."); *Shadduck v. Rodolakis,* 221 B.R. 573, 585 (D. Mass. 1998); *In re Craine,* 206 B.R. 594, 597–98 (Bankr. M.D. Fla. 1997); *In re Brock Utils. & Grading, Inc.,* 185 B.R. 719, 720 (Bankr. E.D.N.C. 1995); *McHenry v. Key Bank (In re McHenry),* 179 B.R. 165 (9th Cir. B.A.P. 1995); *In re Esposito,* 154 B.R. 1011, 1015 (Bankr. N.D. Ga. 1993)*.* "The duty to mitigate reflects the sound judicial policy that profit-making from violations of either the automatic stay or discharge injunction is inherently improper.'"  *In re Mitchell*, 545 B.R. at 220 (citations omitted).

Plaintiff argues § 362(k) contains no obligation to mitigate damages and the above-cited

body of case law apparently should be ignored based on a single line in a 9th Circuit opinion that "[n]othing in the Bankruptcy Code or Federal Rules of Bankruptcy Procedure suggests that such a duty [to mitigate] exists." *Rijos v. Banco Bilbao Vizcaya (In re Rijos)*, 263 B.R. 382, 393 (9th Cir. 2001). The *Rijos* decision, however, did not analyze mitigation in any meaningful way and specifically states it need not reach the issue. *Id.* at 390. The decision rested on a determination that the bankruptcy court denied a debtor due process by deciding a stay violation motion without holding an evidentiary hearing, not a finding that the large body of case law finding a duty to mitigate in stay violation cases is incorrect. In any event, the decision is not binding on this Court, and the Court agrees with the many cases finding debtors have a duty to exercise due diligence to mitigate damages under § 362(k).[11]

The better point raised by Plaintiff is that most mitigation cases involve efforts to stop an ongoing stay violation before incurring attorney's fees by filing a motion for damages. That is not the case here. Plaintiff contacted Investa to try and resolve the stay violation before filing this adversary proceeding, and Debtor has no attorney's fees. But not all mitigation cases deal exclusively with attorney's fees or efforts to stop the stay violation. For instance, *In re Esposito*, a decision from this Court, denied a claim for damages for lost employment for failure to mitigate damages. In that case, a car lender repossessed the debtors' vehicle in violation of the stay, and

___

[11] As Plaintiff's claims arise under § 362(k) of the Bankruptcy Code and are not based on state law, it is not necessary to resort to Georgia law to determine the scope of Plaintiff's duty to mitigate. Even if the Court were to find Georgia law applies, the result would be the same because the Georgia statutes cited by the parties are substantially similar to the standard adopted by courts under § 362(k). *See* O.C.G.A. § 13-6-5 ("[w]here by a breach of contract a party is injured, he is bound to lessen the damages as far as is practicable by the use of ordinary care and diligence."); O.C.G.A. § 51-12-11 ("[w]hen a person is injured by the negligence of another, he must mitigate his damages as far as is practicable by the use of ordinary care and diligence. However, this duty to mitigate does not apply in cases of positive and continuous torts."). Further, assuming O.C.G.A. § 51-12-11 is applicable here, the Court does not find the stay violation here to be a positive and continuous tort. "Georgia courts have defined three types of 'positive and continuous torts': (1) fraud; (2) ongoing violations of property rights; and (3) intentional torts such as assault and battery." *Wachovia Bank of Ga., N.A. v. Namik*, 620 S.E.2d 470, 473 (Ga. App. 2005) (citations omitted). The stay violation is not in the nature of fraud or an intentional tort like assault and battery, nor was it ongoing after Investa canceled the June Tax Sale on May 8.

the debtors lost their jobs after not reporting for work during the period in which the car was held by the lender.  Despite finding the stay violation proximately caused the loss of employment, the Court found the debtors failed to mitigate their damages by making no effort to find alternative transportation to work.  *In re Esposito*, 154 B.R. at 1015.  The Court adopts the implicit reasoning of *Esposito*: the duty to mitigate damages for a stay violation is not limited to stopping the stay violation and attorney's fees.  The purpose behind the duty to mitigate damages—preventing debtors from leveraging a stay violation into a windfall—applies to any form of damages, not just attorney's fees.

This case illustrates the point.  Plaintiff testified that he could have tried to rent the apartment after Tenant moved out "to mitigate that situation," but he elected not to try because of the uncertainty of the June Tax Sale.  As discussed, the Court does not find this testimony credible.  Plaintiff negotiated and agreed to rent the apartment to Tenant while a tax sale was pending (without disclosing the fact to Tenant).  The Court does not accept that his decision not to re-let the apartment to a subsequent tenant was because he was not sure if a tax sale was pending.  Moreover, the Court is not convinced Plaintiff believed the June Tax Sale would occur as scheduled, and even if he did, Plaintiff had at least two months to seek another tenant after the June Tax Sale did not occur and before his water heater broke.  He made no effort to mitigate his damages, and the Court does not find his explanation credible.  The Court believes it is more likely Plaintiff wished to exacerbate his lease damages in this lawsuit rather than mitigate his damages by re-letting the apartment.  Exacerbation of damages also explains Plaintiff's decision to allow Tenant to terminate the lease as soon as he requested to do so in April.  Plaintiff made no effort to require Tenant to honor his lease commitment other than trying to talk him out of it.  Instead, he almost immediately allowed Tenant to terminate the lease and filed this suit in which he asks for

$374,000 in damages. Plaintiff cannot seek to enforce 32 months of lease payments against Defendants when he made no effort to enforce them against Tenant or find another tenant. The evidence established that Plaintiff failed to mitigate his damages by choosing to allow Tenant to terminate the lease and then choosing not to seek another tenant.[12] The Court will nonetheless award the $2,250 of lease damages because Plaintiff could not have re-let the apartment before Tenant moved out at the end of May, and it is reasonable to allow up to two months to find a new tenant.[13]

### 2. Emotional Distress

"[E]motional distress damages fall within the broad term of 'actual damages' in § 362(k)," but "not every willful violation of the stay merits compensation for emotional distress and . . . a standard governing such claims is necessary." *Lodge v. Kondaur Cap. Corp.*, 750 F.3d 1263, 1271 (11th Cir. 2014). "[A]t a minimum, to recover 'actual' damages for emotional distress under § 362(k), a plaintiff must (1) suffer significant emotional distress, (2) clearly establish the significant emotional distress, and (3) demonstrate a causal connection between that significant emotional distress and the violation of the automatic stay." *Id.* "Generalized evidence, without any additional, specific detail, does not show . . . significant emotional distress." *Id.* Normally, the testimony of the plaintiff alone is not sufficient to establish significant emotional distress, and a plaintiff must provide corroborating evidence, such as medical evidence or non-expert testimony from family members, friends, or co-workers. *See Dawson v. Washington Mutual Bank, F.A. (In re Dawson)*, 390 F.3d 1139, 1149-50 (9th Cir. 2004) (cited favorably by Eleventh Circuit in *Lodge*).

---

[12] Though it is Plaintiff's burden to establish damages, it was Defendants' burden to show by a preponderance of the evidence Plaintiff failed to mitigate damages. Plaintiff's testimony at trial that he agreed to let Tenant terminate the lease upon request and did not try to re-let the apartment satisfies that burden.

[13] The Court acknowledges that Plaintiff's water heater broke around two or three months after May, but that fact does not excuse Plaintiff's failure to make any effort to mitigate damages prior to that point.

"Corroborating evidence may not be necessary to prove emotional distress where the violator engaged in egregious conduct and significant emotional distress is readily apparent." *Lodge* 750 F.3d at 1272.

Plaintiff failed to establish significant emotional distress under the *Lodge* standard.  For the most part, Plaintiff's testimony was generalized evidence of sadness and worry related to the loss of his Tenant and the possibility that he would lose his home.  Such generalized evidence does not support a finding of significant emotional distress under *Lodge*.  Even if some portions of Plaintiff's testimony, like sleeplessness, resort to alcohol to suppress appetite, headaches, and physical discomfort from walking, are specific enough to transcend the type of "generalized evidence" found lacking in *Lodge*, Plaintiff offered no corroborating evidence and relied solely on his own testimony.  *Lodge* counsels against awarding emotional distress damages based on such uncorroborated testimony.  The need for corroborating evidence is highlighted here because at least some of Plaintiff's testimony regarding his distress is not credible on its face.  Specifically, Plaintiff testified he experienced stress because he was not able to flush his toilet but also testified his water was never turned off.

Corroborating evidence may not be necessary if a stay violator's conduct is egregious and significant emotional distress is readily apparent, but Plaintiff failed to establish that Investa's conduct was egregious.  Though Investa willfully violated the stay, a willful stay violation does not by itself establish egregious conduct, and the facts of this case weigh against a finding of egregious conduct by Investa.  First, Investa's previous conduct in the case does not show a creditor flaunting the automatic stay or disregarding Plaintiff's rights.  The opposite is true.  The evidence showed that Investa did exactly what it was supposed to do and cancelled the December Tax Sale

within one day of being contacted by Plaintiff on December 3.[14]  Investa then waited until the Bankruptcy Case was dismissed to reinitiate the levy process.  Nothing about Investa's actions prior to the stay violation in this case portrays a creditor acting in an egregious manner.

Second, the fact that Investa's stay violation occurred after reinstatement of a dismissed case merits some consideration in Investa's favor.  It is important to remember that Investa initiated the levy process while Plaintiff's case stood dismissed and the automatic stay was not in effect.  Unlike the filing of a petition, which unequivocally imposes the automatic stay and triggers numerous filings and notices with which creditors and bankruptcy counsel are familiar, the only document Investa received alerting it to the reimposition of the automatic stay was the Reinstatement Order.  That order (submitted on consent by the chapter 13 trustee and Plaintiff) is very simple and says nothing about the automatic stay going back into effect.  As far as the Court can tell, the Bankruptcy Code also says nothing directly about reimposition of the automatic stay when a dismissal order is vacated, but caselaw on the subject clearly indicates that it does. *See MERS, Inc. v. Parks (In re Parks)*, No. 04-41299-MGD, 2005 WL 6491918, *2 (Bankr. N.D. Ga. Feb. 4, 2005) ("When a case is dismissed, the automatic stay is terminated and when a case is reinstated, the automatic stay is also reinstated.").  To be clear, Investa had the responsibility to apprise itself of its obligations following the Reinstatement Order.  Nonetheless, while not relevant to whether Investa's actions were willful, the somewhat unusual circumstance of the stay going back into effect after reinstatement of a dismissal weighs against finding Investa's conduct to be egregious.

Third, Investa's conduct following the Reinstatement Order was consistent with its conduct

---

[14] Debtor's case was filed on November 19, 2018, but the Court's standard notice of the case was not mailed to creditors until November 28, 2018, a Wednesday.  *See* Bankruptcy Case Doc. No. 12.  Assuming three days for mailing, Investa would not have received notice of the case until the following Monday, December 3.

in relation to the December Tax Sale. When Ms. King requested Plaintiff provide her with appropriate documentation to show the case was reinstated and that he owned the property, she was following the same protocol she followed in December. That protocol worked in December. Following the same protocol in April supports the conclusion that Investa was acting in what it considered to be good faith.

But, the protocol did not work in April. When Plaintiff did not provide the information requested by Ms. King, Investa took no further action until after Plaintiff filed this adversary proceeding. This is where Investa's conduct is most problematic. Investa should have been more proactive after the April 16 phone call to confirm whether the automatic stay was in place. It was not Plaintiff's obligation to ensure Investa stopped the levy process, and Investa should not be comfortable with the idea that putting the onus on debtors to provide information will shield it from liability if a debtor's failure to provide information results in a violation of the automatic stay. Further, the Reinstatement Order was mailed to Investa nearly a month prior to April 16, and it remains unclear why Investa's internal processes did not flag the Reinstatement Order. Investa's failure to account for the Reinstatement Order and take action after April 16 make the issue a close call, but when viewed in the context of the whole bankruptcy case, not just the events of April, Investa's failure to cancel the sale process in April does not strike the Court to be "of such an egregious or extreme nature that emotional distress would be expected to occur." *Nibbelink v. Wells Fargo Bank, N.A. (In re Nibbelink)*, 403 B.R. 113, 120 (Bankr. M.D. Fla. 2009). Without corroborating evidence to support Plaintiff's testimony, emotional distress damages will not be awarded.[15]

---

[15] Because Plaintiff failed to establish significant emotional distress, the Court need not determine whether the stay violation caused Plaintiff's alleged emotional distress. Accordingly, the Court need not consider the evidence of other litigation submitted by Defendants and whether Plaintiff's emotional distress was caused by events related to those matters.

3. <u>Punitive Damages</u>

Punitive damages are available under § 362(k), but only in "appropriate circumstances." Such circumstances include "when the violator acts in an egregious intentional manner, . . . where a violator's acts are egregious, malicious, or accompanied by bad faith," *Roche v. Pep Boys, Inc. (In re Roche)*, 361 B.R. 615, 624 (Bankr. N.D. Ga. 2005) (citations omitted), or where the violator acts in "reckless or callous disregard for the law or rights of others." *Green Point Credit, LLC v. McLean (in re McLean)*, 794 F.3d 1313, 1325 (11th Cir. 2015). When determining whether punitive damages are appropriate, "[c]ourts rely on a variation of the following factors: (1) the nature of the defendant's conduct; (2) the nature and extent of the harm to the plaintiff; (3) the defendant's ability to pay; (4) the motives of the defendant; and (5) any provocation by the debtor." *In re Roche*, 361 B.R. at 624.

As discussed above, the Court does not find Investa's conduct to be egregious in this case. Investa's processes and procedures may leave something to be desired, but Plaintiff failed to show that they amount to a reckless or callous disregard of the automatic stay or Plaintiff's rights as a debtor. The process, though flawed, worked in December. The events in April exposed a flaw, which Investa must correct, but the exposure of a flaw does not equate to reckless or callous disregard.[16] Plaintiff failed to produce any evidence that Investa intended to harm him, that it acted with bad faith, malice, or spite, or that its actions were part of a broader pattern of similar

---

[16] The parties spent considerable time in pre-trial litigation arguing whether Defendants would be allowed to submit evidence that Investa's stay violation was the result of a mistake. The Court ruled that Investa would not be allowed to offer such evidence, but it is not Investa's burden to show its actions were the result of a mistake to avoid punitive damages. It is Plaintiff's burden to establish damages by a preponderance of the evidence. *See e.g., In re Horne*, 876 F.3d at 1083*; In re Roche*, 361 B.R. at 624. Ms. King's testimony at trial that this case was a slip up but without any intent or maliciousness directed at Plaintiff is not necessary to the Court's ruling and serves only to highlight the lack of evidence produced by Plaintiff supporting an award of punitive damages. Generally, Plaintiff wants the Court to find the violation in this case *ipso facto* warrants punitive damages, a result that hews close to finding any willful violation merits punitive damages unless the defendant proves otherwise. Plaintiff's position on this point is unsupportable.

conduct.   As mentioned above, the Court gives no weight to Plaintiff's speculative and unsupported allegations that the violation in this case resulted from Investa's ownership liquidating assets to pay down loans.

Plaintiff's only other significant argument for punitive damages is that Investa has shown no remorse or acknowledged any wrongdoing for its actions and instead attempted to blame the Fulton County Sheriff for the stay violation.   This is true.   Investa's litigation strategy was to deny it had any responsibility to stop the levy process.   It is unfortunate Investa chose to take such a position, but the litigation strategy in this case alone does not merit punitive damages when nothing in the record indicates Investa has taken similar strategies in other cases or that it has engaged in a pattern of violating the stay and deflecting blame onto others.   Plaintiff is not entitled to punitive damages.

### C.  GSRAN-Z's Liability

In the Summary Judgment Order, the Court concluded as follows with respect to the liability of GSRAN-Z:

> [T]the record is not clear if GSRAN-Z also had a duty to stop the foreclosure process or if it can be held responsible for the actions of Investa.  The only thing clear in the record is that Investa was the "servicer" for GSRAN-Z, but beyond that general description, the relationship between Defendants is not developed in the motions, briefs, or statements of fact and evidence before the Court.  Neither party includes any discussion in their briefs regarding the liability of GSRAN-Z specifically, whether such liability would be independent of Investa's liability, or whether such liability would arise from the principles of agency or similar doctrines.

In the Consolidated Pretrial Order (Doc. No. 44), Plaintiff stated his intention

> to resubmit the issue on the facts already found and any additional facts if any presented at trial. In his trial brief and or at closing argument and summation [Plaintiff] will raise the doctrine of "apparent authority" as interpreted and applied under Georgia law—which (in cases of an agent's wrongful conduct—offers little if any distinction between principle and agent. See, e.g., *Turnipseed v. Jaje,* 477 S.E.2d 101 (1996), 267 Ga. 320.

Plaintiff did not present any additional evidence at trial relative to GSRAN-Z's liability or address it at all during the trial.  Instead, he relies completely on his Trial Brief for Plaintiff (Doc. No. 47), which does nothing more than cite to GSRAN-Z's interrogatory responses as evidence that GSRAN-Z is liable as the agent of Investa or for its own failure to stop the levy process.  GSRAN-Z's discovery responses, however, were not admitted into evidence at trial according to the Court's records, and the Court simply does not have sufficient evidence before it to conclude that Investa acted as an agent for GSRAN-Z or that GSRAN-Z had any independent duty to stop the levy process.

**IV.    <u>CONCLUSION</u>**

For the foregoing reasons, judgment will be entered in favor of Plaintiff and against Investa in the amount of $2,250.  Judgment will be entered in favor of GSRAN-Z on all counts.  The Court will enter a separate judgment consistent with this Memorandum Opinion.

The Clerk of Court is directed to serve a copy of this order on Plaintiff, Defendants, Defendants' Counsel, and the Chapter 13 Trustee.

END OF DOCUMENT